UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TORI BELLE COSMETICS LLC,<br><br>Plaintiff,<br><br>v.<br><br>NATALIE MEEK, *et al.*,<br><br>Defendants. | NO. C21-0066RSL<br><br>ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS |

This matter comes before the Court on "Defendants' Motion to Dismiss First Amended Complaint for Failure to State a Claim." Dkt. # 29. Plaintiff sells cosmetics and false eyelashes through a network of salespeople it calls "Affiliates." The Affiliates recruit additional Affiliates, earning a portion of the proceeds from a recruit's sales and forming a branching sales team. Plaintiff alleges that five of its former Affiliates are using or have used the social media and communication channels they had developed while they were Tori Belle Affiliates for the benefit of a competing venture, defendants Juvenae LLC and Juvenae Holdings LLC. Plaintiff asserts claims of breach of contract (Counts I and II), tortious interference with contract and prospective business expectancy (Counts III, IV, and V), violation of the Defend Trade Secrets Act (Count VI), civil conspiracy (Count VII), and conversion (Count VIII). Defendants seek dismissal of all of plaintiff's claims with prejudice.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 1

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." []*Twombly*, 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule 8(a)(2), a party must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144-45 (9th Cir. 2021). If the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim, dismissal is appropriate. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 2

**A. Breach of Contract Claims (Counts I and II)**

Plaintiff alleges that individuals interested in becoming a Tori Belle Affiliate must complete an online process, during which the individual is required to check a box indicating that they have had the opportunity to read the contracts that govern the relationship between Tori Belle and its Affiliates and that they agree to its terms. Dkt. # 24 at ¶ 53. The five former Affiliates named as defendants in this matter all completed the on-line process on June 11, 2019, when plaintiff's business launched. Dkt. # 24 at ¶ 56. They then received an email confirming their new status as Affiliates and disclosing the terms of the contracts to which they had previously agreed. Dkt. # 24 at ¶ 57.

The governing contracts contain a number of promises and provisions. Plaintiff alleges material breaches of Sections 2.11, 2.13, 5.4, and 11 of the "Policies and Procedures of the Tori Belle Independent Affiliate Agreement" without specifically identifying which covenants are at issue. Dkt. # 24 at ¶¶ 164, 166, 170, and 172. Defendants challenge the viability of plaintiff's breach of contract claims, arguing that the noncompete and nonsolicitation provisions are not enforceable under Washington law, that plaintiff failed to adequately allege the disclosure of any confidential information, and that the nondisparagement provision does not apply post-termination and/or has not been breached.

**1. Noncompete/Anti-Moonlighting**

Plaintiff asserts that defendants' characterization of Count I of the First Amended Complaint is misleading in that plaintiff has alleged a breach of an anti-moonlighting clause, not a noncompete provision. Section 2.11 of the "Policies and Procedures of the Tori Belle Independent Affiliate Agreement" (hereinafter, the "Affiliate Agreement") is entitled

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 3

"Participation in Other Business or Network Marketing Programs" and states, "Affiliate may NOT sell products for other companies that sell false eyelash products. . . . Affiliates found to be selling for other companies that sell these competitive items will be suspended and/or terminated." Dkt. # 24-1 at 41 (emphasis in original). Plaintiff does not, however, allege that any of the former Affiliates sold Juvenae products while they were engaged as independent contractors for Tori Belle. Rather, plaintiff argues that the former Affiliates were in communication with and began promoting the interests of its competitor before they resigned from (or were fired by) Tori Belle. The anti-moonlighting provision is very specific, however, and bars the sale of competing false eyelash products, not general disloyalty.

      To the extent plaintiff now hopes to use Section 2.11 to prevent its former Affiliates from ever selling false eyelashes for another company, both the language of the agreement and the allegations of the First Amended Complaint make clear that the "anti-moonlighting duties apply only during one's tenure as an Affiliate." Dkt. # 24 at ¶ 68.b. Any attempt to limit, restrain, or prohibit its former Affiliates' ability to engage in direct sales of false eyelash products after leaving Tori Belle would be properly characterized as a noncompetition provision. RCW 49.62.010(4). "A noncompetition covenant is void and unenforceable against an independent contractor unless the independent contractor's earnings from the party seeking enforcement exceed two hundred fifty thousand dollars per year." RCW 49.62.030(1). Plaintiff alleges that its former Affiliates were independent contractors and that they earned less than $250,000 per year. Dkt. # 24 at ¶¶ 65 and 81; Dkt. # 24-1 at 2. Thus, even if the anti-moonlighting clause could reasonably be read to prevent competition after an Affiliate has left Tori Belle, it would be void and unenforceable under Washington law.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 4

**2. Nonsolicitation**

Section 5.4 of the Affiliate agreement precludes an Affiliate from recruiting any Tori Belle Affiliate or customer to participate in another direct sales or network marketing opportunity. Dkt. # 24-1 at 64. The prohibition applies during the term of the agreement and for six months after its termination. *Id.* "In Washington, the non-compete statute explicitly excludes non-solicitation agreements from its strict enforceability requirements." *A Place for Mom v. Perkins*, 475 F. Supp.3d 1217, 1230 (W.D. Wash. 2020); RCW 49.62.010(4) ("'Noncompetition covenant' includes every written or oral covenant . . . by which an employee or independent contractor is prohibited or restrained from engaging in a lawful profession, trade, or business of any kind. A 'noncompetition covenant' does not include: (a) A nonsolicitation agreement . . . ."). Defendants nevertheless argue that the nonsolicitation covenant at issue here is not enforceable because it does not fall within the statutory definition of "nonsolicitation agreement."

RCW 49.62.010(5) defines a "nonsolicitation agreement" as "an agreement between an employer and employee that prohibits solicitation by an employee, upon termination of employment: (a) Of any employee of the employer to leave the employer; or (b) of any customer of the employer to cease or reduce the extent to which it is doing business with the employer." Because Affiliates are indisputably independent contractors, defendants argue that there is no agreement between an employer and employee and that plaintiff cannot plausibly accuse the Affiliates of soliciting "employees" or customers of an "employer." Defendants therefore conclude that the nonsolicitation provision at issue here falls within the general definition of "noncompetition" under RCW 49.62.010(4) and is unenforceable unless the independent contractor earns more than $250,000 per year..

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 5

Neither party cites, and the Court has not found, any case or legislative history that discusses this issue. Plaintiff alleges that RCW 49.17.020(4) and (5) provide the applicable definitions for the terms "employer" and "employee" and that those definitions clearly encompass independent contractors. Dkt. # 24 at ¶ 78. Although an assertion regarding statutory interpretation and applicability is a legal conclusion that is "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 680, plaintiff is correct. The noncompetition statute expressly states that "'[e]mployee' and 'employer' have the same meanings as in RCW 49.17.020." RCW 49.62.010(2). Those definitions include in the term "employer" any business entity that contracts with one or more persons for personal labor and include in the term "employee" a person who is working under an independent contract. RCW 49.17.020(4) and (5). Thus the plain language of the statute's nonsolicitation carveout and the relevant definitions shows that nonsolicitation agreements are enforceable as to both employees and independent contractors. *Whatcom Cnty. v. City of Bellingham*, 128 Wn.2d 537, 546 (1996) ("When the statute's meaning is plain on its face, we give effect to the plain meaning of the statute as an expression of legislative intent.") (citation omitted). This construction is also consistent with the legislative findings "that workforce mobility is important to economic growth and development" and "that agreements limiting competition or hiring" may be unreasonable. RCW 49.62.005. The legislature's goal of ensuring that Washington laborers have the flexibility to change jobs (or are substantially compensated if they give up that flexibility) is accomplished through the imposition of restrictions on noncompete provisions regardless whether the same laborer is contractually prevented from poaching employees or stealing customers once a new situation is acquired.

      Defendants argue that reading the term "employee" to mean employees and independent

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 6

contractors would vitiate RCW 49.62.030, making it "meaningless" or "nonsensical." Dkt. 29 at 15. The Court disagrees for two reasons. First, there is no ambiguity in the statutory adoption of RCW 49.17.020(4) and (5) for purposes of the noncompetition statute. Defendants would have the Court ignore RCW 49.62.010(2) in its entirety, which it is not free to do. Second, interpreting the word "employee" to mean employees and independent contractors has no impact on RCW 49.62.030 or this case. Where the legislature intended to make a distinction between the way in which employees and independent contractors are treated, it used the term "independent contractor." RCW 49.62.030, for example, clearly and unambiguously applies to independent contractors, and defendants' status as independent contractors is not in dispute. While the incorporated definitions may create an ambiguity in RCW 49.62.020 (*i.e.*, a court may ultimately have to apply Washington's rules of statutory interpretation to determine whether that subsection applies only to employees or to employees and independent contractors), it does not invalidate or make meaningless the statutory provision prohibiting enforcement of noncompetition agreements against independent contractors who make less than $250,000.

In the alternative, defendants argue that Section 5.4 of the Affiliate Agreement is a nonsolicitation clause in name only and/or that plaintiff has not adequately alleged a breach. Defendants assert that Section 5.4 in fact bars former Affiliates from working for any other direct sales company. The contractual language belies this argument, however: "Affiliates are free to participate in other direct sales, social selling, multilevel or network marketing business ventures or marketing opportunities," but they "may not recruit any Tori Belle Affiliate" or customer to enroll or participate in such ventures or opportunities. Dkt. # 24-1 at 64. This is a classic nonsolicitation provision.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 7

With regards to the adequacy of plaintiff's allegations, plaintiff alleges that defendant Meek reached out to other Tori Belle Affiliates, including the other former Affiliates named as defendants in this lawsuit, to solicit them to leave Tori Belle with her and/or to encourage them to speak to defendants Scott Seedall and his company, Juvenae. Dkt. # 24 at ¶¶ 91 and 118. Meek allegedly promoted Juvenae's compensation plan, personnel, and business opportunities while assuring Tori Belle Affiliates that the Affiliate Agreement was unenforceable. Dkt. # 24 at ¶ 93. Meek organized a Zoom meeting, inviting other Affiliates to "Meet Scott Seedall & Juvenae" and touting the benefits of working for the new company. Dkt. # 24 at ¶¶ 94 and 96. Following the termination of her agreement with Tori Belle, Meek used the same communication networks through which she had conducted Tori Belle business to (1) announce her termination, thank her Tori Belle team and express her hope that "[t]his isn't goodbye, it is see you later," and provide a teaser regarding next steps (Dkt. # 24 at ¶ 106); (2) announce that she had joined Juvenae and was looking forward to sharing "great things coming in the near future" with her readers (Dkt. # 24 at ¶¶ 109 and 111); (3) praise her Tori Belle team and promise "we will have that again friends" (Dkt. # 24 at ¶ 119); (4) announce the Juvenae product launch and solicit orders for Juvenae lashes (Dkt. # 24 at ¶ 124); (5) invite and encourage her readers to become Juvenae Ambassadors (Dkt. # 24 at ¶¶ 124 and 133); (6) fawn over Juvenae and its corporate staff (Dkt. # 24 at ¶ 131); and (7) congratulate former Tori Belle Affiliates on hitting sales targets and earning bonuses with Juvenae (Dkt. # 24 at ¶ 141.f.).

With regards to the other former Affiliate defendants, plaintiff alleges that:

(1) Russo used her Tori Belle communication channel to let people know that she had decided to resign from Tori and to invite them to a Juvenae party so they could see if it "could be a wonderful fit for you!" (Dkt. # 24 at ¶¶ 113 and 122);

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 8

(2) Meek and/or Russo solicited defendant Hone to leave Tori Belle and join Juvenae (Dkt. # 24 at ¶ 121);

(3) Meek, Russo, Hone, and Rutledge solicited defendant Jones to leave Tori Belle and join Juvenae (Dkt. # 24 at ¶ 127);

(4) Jones used her Tori Belle communication channel to let people know that she had joined a new direct sales company (Dkt. # 24 at ¶ 125);

(5) Russo and Jones, using the same communication channels they had used as Tori Belle Affiliates, fawned over Juvenae and its corporate staff (Dkt. # 24 at ¶ 131);

(6) Rutledge used her Tori Belle communication channel to advertise a new lash product and invite her readers to purchase the product and/or join her in her new business opportunity (Dkt. # 24 at ¶¶ 135 and 145); and

(7) Russo and Jones congratulated former Tori Belle Affiliates on hitting sales targets and earning bonuses with Juvenae (Dkt. # 24 at ¶ 141.d., e., and g.).

Plaintiff further alleges on information and belief that the majority of the communications that constitute unlawful solicitation "occurred not in public Facebook posts like those excerpted [in the First Amended Complaint], but rather via Facebook DMs and messenger groups, private and secret Facebook groups of which Defendants or any of them are admins, text message and email communications, phone calls, and video chats." Dkt. # 24 at ¶ 144. There is evidence that the repeated communications had an impact on Tori Belle Affiliates. Between Thanksgiving and Christmas 2020, "scores" of Tori Belle Affiliates defected to Juvenae, resulting in nearly $1 million in lost sales revenue over the holiday season. Dkt. # 24 at ¶ 146. In January 2021, an Affiliate posted to her own social network that she had been watching Meek and Russo develop the Juvenae lash line and had decided to join them. Dkt. # 24 at ¶ 141.b.

      Section 5.4 prohibits recruitment, which it defines as, *inter alia*, the "encouragement[] or effort to influence in any other way, either directly, indirectly, or through a third party" other Affiliates or customers to participate in or patronize another direct sales network marketing

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 9

venture. *Id.* The allegations regarding the former Affiliates' conduct are sufficient to raise a plausible inference that they have run afoul of the nonsolicitation agreement set forth in Section 5.4 of the Affiliate Agreement.

### 3. Confidential and Proprietary Information

Section 11 of the Affiliate Agreement designates as confidential, *inter alia*, contact information regarding customers, any and all information regarding Affiliates (including their upline and downline affiliations), business materials, promotions, compensation plans, and all information contained in a password protected area of Tori Belle's website (including training materials). Dkt. # 24-1 at 71-72. The contract prohibits Affiliates from disclosing confidential information to third parties, using the information to compete with Tori Belle, or using the information to convince an Affiliate or Customer to alter their business relationship with Tori Belle. Dkt. # 24-1 at 72. Plaintiff alleges on information and belief that its former Affiliates used Tori Belle's trade secret training materials, customer and Affiliate contact lists, and confidential information regarding "product plans, upcoming initiatives, [and] financials" to create Juvenae's competing line of false eyelash products, to train its nascent sales force, and to acquire a sales force and customers. Dkt. # 24 at ¶¶ 83 and 154-56.[1]

Defendants argue that Tori Belle's proprietary training materials have not been kept in confidence and therefore cannot be the basis of a breach of confidentiality claim. In particular, defendants point out that Tori Belle allowed its Affiliates to publish the training materials to a Facebook group ("Team Lash Out") which had thousands of members. Based solely on this

---

[1] Plaintiff has apparently abandoned its contractual claim that defendants' Facebook contact lists (made up of each Affiliate's friends and followers) are Tori Belle's confidential information.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 10

allegation, defendants assert that "[i]nformation posted to the world's largest social media website is, by definition, not confidential (and certainly not a trade secret)." Dkt. # 31 at 9. Defendants' argument ignores both the realities of the on-line communication platform and plaintiff's allegations. Facebook allows users to control the audience that gets to see their posts and messages. While a user may opt to have all of his or her information and communications open to the public, the user may also choose to have a particular communication seen by only selected individuals, by only those whom they have accepted as friends, or by only those who have been admitted into a private group. Courts have evaluated the actual selections made and the nature of the communications when determining whether confidences were adequately maintained (*Finder v. Leprino Foods Co.*, No. 1:13-CV-2059-AWI-BAM, 2017 WL 1272350, at *6 (E.D. Cal. Jan. 20, 2017)) and have allowed suits to proceed based on allegations that a user's privacy choices have been circumvented (*Jackson v. Amazon.com, Inc.*, No. 20-CV-2365-WQH-BGS, 2021 WL 4197284, at *1 (S.D. Cal. Sept. 15, 2021) (Amazon.com allegedly spying on members of a private Facebook group); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 838–39 (N.D. Cal. 2014) (challenging Facebook's scanning of "private" messages)). Plaintiff alleges that "Team Lash Out" was a private Facebook group which was used for training purpose, that only Tori Belle Affiliates were permitted to join the group, and that each Affiliate had agreed to keep the training materials that were shared in the group confidential. Dkt. # 24 at ¶¶ 88 and 150. Taken as true, the allegations of the First Amended Complaint adequately state a breach of defendants' promise to keep the training materials confidential.

      With regards to Tori Belle's Affiliate, customer, and prospective customer lists, defendants assert, without citation to authority, that their ownership interests in their Facebook

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 11

profile (and the friends and followers the profile has attracted) precludes plaintiff's confidentiality claim, as does the fact that each defendant's Facebook friends can see the rest of their friend network. The fact that an employee or independent contractor contributed to or created a customer list does not preclude him or her from agreeing that the list was generated on behalf of the company and that he or she will not use it for the benefit of a third party. That is the agreement that defendants made, and allegedly breached, in this case: the Affiliate Agreement clearly identifies customer and affiliate lists as confidential and precludes their disclosure or use in competition with Tori Belle. Dkt. # 24-1 at 72. Nor does the fact that one facet of a contact list may be publicly available destroy the confidentiality of compilations of data that includes the public information. In this case, defendants argue that their Facebook friends and followers can see the information plaintiff claims is confidential. There is no evidence to support this assertion, however. What Facebook users can see depends entirely on a profile's privacy settings and the nature of the connection, be it as a "friend," a webpage "like," or a "message." Generally, the most revealing settings would show each friend the name and profile picture of other friends. But the value of a compilation is rarely one particular item. Tori Belle seeks to protect the list of Affiliates as opposed to the list of customers, their respective phone numbers and addresses, and their Affiliates' performance reports, compensation, upline networks, and downline networks. Plaintiff has adequately alleged that the compiled information has been kept in confidence and that the former Affiliates breached their promise to keep that confidence.[2]

---

[2] If, despite the allegations of the First Amended Complaint, plaintiff's breach of confidentiality claim is based solely on its former Affiliate's use of a Facebook contact list that is visible to persons who have not signed the Affiliate Agreement, defendants may renew this argument in the context of a motion for summary judgment.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 12

Finally, plaintiff's allegations that its former Affiliates were privy to high-level corporate discussions regarding product plans, upcoming initiatives, and financials (Dkt. # 24 at ¶ 83) and that defendants Meek and Russo used this information to develop Juvenae's competing eyelash product line (Dkt. # 24 at ¶ 156) adequately pleads a plausible claim of breach of the confidentiality provision with regards to those two defendants.

**4. Nondisparagement**

Section 2.13 of the Affiliate Agreement governs Affiliate conduct and precludes Affiliates from making disparaging remarks to any member of the public regarding Tori Belle or any personnel associated with the company. "Disparaging remarks" is defined to include "any unfavorable remarks regarding Company, Company products or Company services or any unfavorable remarks regarding the Company business opportunity, support, earning potential, reputation or image . . . ." Dkt. # 24-1 at 42. To the extent the remarks about which plaintiff complains were made after defendants were no longer Affiliates, there is no language in Section 2.13 suggesting that the provision survives the termination of the contract. The promises and obligations set forth in the agreement are generally undertaken "[a]s an independent Affiliate" (Dkt. # 24-1 at 36), and Section 16 of the agreement specifies that its term is month-to-month (Dkt. # 24-1 at 74). Where a promise extends beyond the termination of the Agreement, such as in the case of the nonsolicitation provision, the contract specifies the applicable post-termination period. *See* Dkt. # 24-1 at 64. No such language is included in Section 2.13.

With regards to defendant Meek, plaintiff alleges on information and belief that she "began to disparage and complain about Tori Belle and its CEO, Laura Hunter, in various posts within the Team Lash Out group" a few months before her contract was terminated. Dkt. # 24 at

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 13

¶ 89. Team Lash Out, as described in the First Amended Complaint, was a private forum for Tori Belle Affiliates. Dkt. # 25 at ¶ 150. Plaintiff has not, therefore, alleged a disparaging remark to the public and has not adequately alleged a disparagement claim under the contract.

**B. Tortious Interference Claims (Counts III, IV, and V)**

Plaintiff alleges that the former Affiliate defendants, Seedall, and the Juvenae entities tortiously interfered with its contracts and prospective business expectancies. The contract claim is based on "contracts with various Affiliates as well as contracts for sale with various customers who purchase or have purchased or placed orders for Tori Belle products." Dkt. # 24 at ¶¶ 175, 185, and 195. The prospective business expectancy claim is based on Tori Belle's anticipation of "economic benefit in the form of recruiting new Tori Belle Affiliates and making additional sales to prospective and repeat customers and to Affiliates." Dkt. # 24 at ¶ 176, 186, and 196. Defendants argue that these claims fail because they are simply an end run around Washington's noncompetition statute, which makes noncompetition clauses unenforceable unless the independent contractor earns at least $250,000 per year. RCW 49.62.090(1)(a) provides that the noncompetition statute "displaces conflicting tort, restitutionary, contract, and other laws of [Washington] state pertaining to liability for competition by employees or independent contractors . . . ." Plaintiff cannot, therefore use its tortious interference claim to pursue the unenforceable noncompetition covenant. It may, however, base its tortious interference claim on allegations that defendants interfered with plaintiff's contracts with other Affiliates when they solicited their participation in the Juvenae venture and caused them to terminate their agreements with Tori Belle.

In order to state a plausible tortious interference claim, plaintiff must allege "(1) the

existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage. *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 157 (1997).[3] Plaintiff has adequately alleged the existence of contracts with Affiliates (in the form of the Affiliate Agreements), that defendants knew of those contracts, that they nevertheless encouraged other Affiliates to terminate those contracts and join Juvenae in violation of their nonsolicitation provision, and that the resulting defections caused plaintiff a substantial loss of revenue. Defendants have not attempted to show that their conduct was justified or privileged.

To the extent the interference claims are based on plaintiff's loss of customers, the analysis is less straightforward. Plaintiff does not argue that it had contracts for the purchase of false eyelashes with which defendants interfered, but rather that it expected future business from existing customers. "A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wn. App. 151, 158 (2002). Although an enforceable contract is not required to support a tortious interference claim, plaintiff must allege "a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition."

---

[3] The Washington Supreme Court had previously established a four element analysis, omitting the "improper purpose or improper means" element and instead shifting the burden to defendants to show that its interference was justified or privileged if plaintiff established the other four elements. *Pleas v. City of Seattle*, 112 Wn.2d 794, 800-01 (1989) (en banc) (quoting *Calborn v. Knudtzon*, 65 Wn.2d 157, 162-63 (1964)). Regardless whether improper purpose/means is an element of the claim or an affirmative defense, plaintiff's pleading is sufficient.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 15

*Scymanski v. Dufault*, 80 Wn.2d 77, 84-85 (1971). "Courts allow tortious interference claims where a defendant's acts destroy a plaintiff's opportunity to obtain prospective customers. Washington courts require a plaintiff to show only that its future business opportunities are a reasonable expectation and not merely wishful thinking." *Greensun Grp., LLC v. City of Bellevue*, 7 Wn. App. 2d 754, 768-69 (2019). Read in the light most favorable to plaintiff, the First Amended Complaint adequately alleges a valid business expectancy. Plaintiff was a fully functional venture with existing customers, a sales track record, and reasonable expectations for the 2020 holiday season which were allegedly not met because of defendants' interference.

Interference is intentional under the third element of a tortious interference claim "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Newton Ins. Agency*, 114 Wn. App. at 158. "Interference is for an improper purpose if it is wrongful by some measure beyond the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188–89 (W.D. Wash. 2019). Merely "[a]sserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose" (*Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 12 (1989)), but plaintiff has alleged that the means defendants employed – namely the solicitation of both plaintiff's sales force and its customers – was wrongful under the Affiliate Agreement. Plaintiff has, therefore, adequately alleged tortious interference with its expectancy of business from its former customers.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 16

**C. Defend Trade Secrets Act (Count VI)**

The Defend Trade Secrets Act confers a private cause of action on "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "Misappropriation" is defined to include "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . ." 18 U.S.C. § 1839(5). Plaintiff alleges that it is the owner of a training program and contact lists that are related to false eyelashes, the sale of which generates millions of dollars in revenue. Dkt. # 24 at ¶¶ 212-13. Plaintiff further alleges that it has taken reasonable efforts to maintain the secrecy of this information through the use of nondisclosure and confidentiality agreements, password-protected access, and closed/private group training sessions. Dkt. # 24 at ¶ 214. The former Affiliate defendants used these trade secrets in service of Juvenae, causing plaintiff financial harm, despite having agreed that the information was confidential and that they owed a duty to maintain the secrecy of the information. Notwithstanding defendants' arguments that the training program has not been maintained in secrecy, that defendants' Facebook profiles, posts, and friends and followers lists do not belong to plaintiff, that they did not misappropriate the training program or contact lists, and that plaintiff has not shown damages, the Court finds that plaintiff has adequately alleged a Defense of Trade Secrets Act

violation.[4]

**D. Civil Conspiracy (Count VII)**

Defendants argue that "Tori Belle's conspiracy claim fails because its other claims fail." Dkt. # 31 at 11. For the reasons discussed above, however, plaintiff's nonsolicitation, confidentiality, tortious interference, and trade secret claims survive defendants' motion to dismiss. Plaintiff's allegations of a conspiracy are sufficient.

**E. Conversion (Count VIII)**

Plaintiff alleges that it has a property interest in Team Lash Out, the private Facebook group the former Affiliate defendants were required to develop on Tori Belle's behalf. Dkt. # 24 at ¶ 240. Pursuant to Section 2.10 of the Affiliate Agreement, the former Affiliate defendants were expected to "share [their experiences in sales techniques, product knowledge, and understanding of the Tori Belle Cosmetic's program] with lesser experienced Affiliates within their organization" and were required to "establish[] a venue for group communication such as a Facebook group, messenger group, email threat, etc. and respond[] to those communications in a positive and helpful manner." Dkt. # 24-1 at 40-41. Elsewhere, the Affiliate defendants acknowledged that "[a]ny and all information regarding Affiliate's Personal Team, Affiliate's Downline, and Affiliate's Upline" was confidential and would not be used "for any reason other than for pursuing [the Affiliate's] Tori Belle Business." Dkt. # 24-1 at 71. Plaintiff alleges that, following their departure from Tori Belle, the Affiliate defendants kicked out those

---

[4] To the extent defendants are arguing that plaintiff must show that they acquired the trade secrets through improper means, they are mistaken. The definition of misappropriation covers a wide array of conduct. Here, plaintiff has adequately alleged that defendants, being fully aware of their contractual obligations, used plaintiff's training materials, Affiliate lists, and customer lists without permission and for the benefit of a competitor.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 18

administrators of Team Lash Out who remained loyal to Tori Belle, effectively hijacking a forum that had been developed as a Tori Belle asset and converting it into a Juvenae recruiting and training site. The conversion claim is not based on defendants' retention of their own Facebook profile and friends/followers, but rather on their refusal to turn over the administrative keys to a private Facebook group they (and others) had developed on plaintiff's behalf. Plaintiff has adequately alleged conversion.

For all of the foregoing reasons, defendants' motion to dismiss (Dkt. # 29) is GRANTED in part and DENIED in part. Plaintiff's noncompetition/anti-moonlighting and nondisparagement breach of contract claims are dismissed. Defendants' motion to stay discovery (Dkt. # 32) is DENIED as moot.

Dated this 7th day of March, 2022.

*Robert S. Lasnik* (signature)

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS - 19